Slip Op. No. 24-112

## UNITED STATES COURT OF INTERNATIONAL TRADE

NIPPON STEEL CORPORATION,

> *Plaintiff,*

*and*

JFE SHOJI CORPORATION and JFE SHOJI AMERICA, LLC,

> *Plaintiff-Intervenors,*

v.

UNITED STATES,

> *Defendant,*

*and*

NUCOR CORPORATION, STEEL DYNAMICS, INC., and SSAB ENTERPRISES, LLC,

> *Defendant-Intervenors.*

Before: Stephen Alexander Vaden, Judge

Court Nos. 1:21-cv-00533, 1:22-cv-00183, 1:23-cv-00112 (SAV)

## <u>OPINION</u>

[Granting in Part and Denying in Part Plaintiff's Motion for Judgment on the Agency Record in the case arising from the third administrative review; sustaining Commerce's Remand Results in the case arising from the third administrative review; sustaining Commerce's Final Determinations in the cases arising from the fourth and fifth administrative reviews.]

Dated: October 10, 2024

*Shawn M. Higgins* and *Rajib Pal*, Sidley Austin LLP, of Washington, DC, for Plaintiff Nippon Steel Corporation.  With them on the briefs were *Justin R. Becker* and *Lindsey A. Ricchi.*

*Brenda A. Jacobs*, Jacobs Global Trade & Compliance LLC, of McLean, VA, for Plaintiff-Intervenors JFE Shoji Corporation and JFE Shoji America, LLC.

*Stephen C. Tosini*, Senior Trial Attorney, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, of Washington, DC, for Defendant United States. With him on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, *Tara K. Hogan*, Assistant Director, and *Kyle S. Beckrich*, Trial Attorney, and *David W. Richardson*, Of Counsel, Department of Commerce, Office of Chief Counsel for Trade Enforcement & Compliance.

*Jeffrey D. Gerrish*, Schagrin Associates, of Washington, DC, for Defendant-Intervenors Steel Dynamics, Inc. and SSAB Enterprises, LLC.  With him on the brief was *Roger B. Schagrin.*

*Maureen E. Thorson*, Wiley Rein LLP, of Washington, DC, for Defendant-Intervenor Nucor Corporation.  With her on the brief was *Alan H. Price*, *Christopher B. Weld*, *Jeffrey O. Frank*, and *Enbar Toledano.*

**Vaden, Judge**:  These three cases address consecutive administrative reviews of the same antidumping duty order.  Nippon Steel Corporation (Nippon Steel), a Japanese steel importer, was a mandatory respondent in each of the reviews.  In the third administrative review, Nippon Steel failed to provide downstream sales data from one of its affiliated resellers despite the Department of Commerce's (Commerce) repeated requests.  Commerce applied a partial adverse inference to fill the gap left in the record by the missing data, and Nippon Steel now protests that Commerce did not support its determination with substantial evidence.  Nippon Steel also challenged Commerce's calculation of its U.S price in the third administrative review for failing to include certain revenue.  Commerce requested a voluntary remand on that issue, and no party contests its Remand Results.  Finally, Nippon Steel claims

that Commerce improperly deducted Section 232 duties from its U.S. prices to calculate the dumping margins in all three cases. Nippon Steel's Motion for Judgment on the Agency Record challenging the application of a partial adverse inference is **GRANTED**. All others are **DENIED**. Commerce's determinations in the fourth and fifth administrative reviews are **SUSTAINED** in full.

## BACKGROUND

Before the Court are three lawsuits brought by Nippon Steel against the United States. The suits arise from three consecutive administrative reviews of Commerce's antidumping duty order on certain hot-rolled steel flat products from Japan (the Order). *Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, the Republic of Korea, the Netherlands, the Republic of Turkey, and the United Kingdom: Amended Final Affirmative Antidumping Determinations for Australia, the Republic of Korea, and the Republic of Turkey and Antidumping Duty Orders*, 81 Fed. Reg. 67,962 (Dep't of Com. Oct. 3, 2016).

The first lawsuit arises from the third administrative review of the Order. Nucor Corporation (Nucor); Steel Dynamics, Inc.; and SSAB Enterprises, LLC intervened as Defendant-Intervenors. Order Granting Nucor's Mot. to Intervene (Nov. 5, 2021), Case No. 21-533, ECF No. 18; Order Granting Steel Dynamics and SSAB's Mot. to Intervene (Nov. 9, 2021), Case No. 21-533, ECF No. 23. In the second suit arising from the fourth administrative review, Nucor again intervened as Defendant-Intervenor; and JFE Shoji Corporation and JFE Shoji America, LLC intervened as Plaintiff-Intervenors. Minute Order (Aug. 12, 2022), No. 22-183, ECF

No. 26; Order Granting JFE Shoji Corp. and JFE Shoji Am., LLC's Mot. to Intervene (Aug. 5, 2022), No. 22-183, ECF No. 20.   In the third suit arising from the fifth administrative review, Nucor alone intervened as Defendant-Intervenor.   Order Granting Nucor's Mot. to Intervene (July 27, 2023), No. 23-112, ECF No. 20.

These three unconsolidated cases raise two issues.   First, in all three cases, Nippon Steel claims that Commerce improperly deducted Section 232 duties from Nippon Steel's U.S. prices.   Second, solely in the case arising from the third administrative review, Nippon Steel claims Commerce erred by drawing an adverse inference from facts available to fill a gap left by missing downstream sales data.

## Section 232 Duties

Section 232 of the Trade Expansion Act of 1962 allows for the imposition of tariffs to remedy national security threats.   19 U.S.C. § 1862.   The statute permits Commerce to conduct investigations "to determine the effects" imported articles have on the national security of the United States.   *Id.* § 1862(b)(1)(A).   Commerce must "submit … a report" of its findings and recommendations to the President, including recommended actions to address threats posed by the investigated imports.   *Id.* § 1862(b)(3)(A).   Following receipt of the report, the President may "adjust … imports" to remedy the threat.   *Id.* § 1862(c)(1)(A)(ii).

In 2018, Commerce submitted a report to President Trump detailing its investigation into the effects of imported steel articles on the United States' national security.   Off. of Tech. Evaluation, U.S. Dep't of Com., THE EFFECT OF IMPORTS OF STEEL ON THE NATIONAL SECURITY:  AN INVESTIGATION CONDUCTED UNDER SECTION

232 OF THE TRADE EXPANSION ACT OF 1962, AS AMENDED (2018). It found that a large volume of imports threatened to impair national security and noted the domestic industry's "shrinking ability to meet national security production requirements in a national emergency." *Id.* at 6, 49. To "remove the threatened impairment," Commerce recommended the President impose a global tariff of twenty-four percent on imports of steel articles. *Id.* at 59–60.

President Trump concurred with Commerce's finding. Proclamation 9705 Adjusting Imports of Steel into the United States, 83 Fed. Reg. 11,625, 11,626 (Mar. 15, 2018). In Proclamation 9705, the President imposed a twenty-five percent *ad valorem* tariff on steel articles from all countries except Canada and Mexico, which entered the United States on or after March 23, 2018. *Id.* at 11,626–27. The Proclamation directed that the tariff be imposed "in addition to any other duties, fees, exactions, and charges applicable to such imported steel articles." *Id.* at 11,627.

Nippon Steel imported steel articles into the United States after this tariff went into effect. Accordingly, it reported paying Section 232 duties on its U.S. sales in each of the administrative reviews at issue. *See* Ex. C-1, Nippon Steel Section C Questionnaire Resp. (June 30, 2020), No. 21-533, J.A. at 3,050–113, ECF No. 41; Ex. C-1, Nippon Steel Section C Questionnaire Resp. (Aug. 20, 2021), No. 22-183, J.A. at 82,524–46, ECF No. 46; Ex. C-1, Nippon Steel Section C Questionnaire Resp. (Apr. 27, 2022), No. 23-112, J.A. at 83,752–805, ECF No. 21. To calculate Nippon Steel's dumping margin in each review, Commerce deducted Section 232 duty payments from the U.S. price of the subject merchandise. *See* Issues and Decision Mem. (Aug.

23, 2021) at 10–11, No. 21-533, J.A. at 2,470–71, ECF No. 41; Issues and Decision
Mem. (May 19, 2022) at 8, No. 22-183, J.A. at 3,711, ECF No. 47; Issues and Decision
Mem. (May 1, 2023) at 10, No. 23-112, J.A. at 3,286, ECF No. 22. Dumping margins
are determined by comparing the sales price in the United States to the sales price
in Nippon Steel's Japanese home market. *See* 19 U.S.C. § 1675(a)(2)(A). Anything
that reduces U.S. price makes the dumping margin rise. Therefore, Commerce's
decision to deduct the Section 232 duties increased Nippon Steel's dumping margin
by reducing the U.S. price.

Under 19 U.S.C. § 1677a(c)(2)(A), "[U.S. price] shall be … reduced by … the
amount, if any, included in such price, attributable to any . . . United States import
duties, which are incident to bringing the subject merchandise from the original place
of shipment in the exporting country to the place of delivery in the United States[.]"
This helps ensure an "apples [to] apples" comparison between merchandise sold in
the home market and the U.S. market by deducting costs associated with
transporting merchandise to the United States before the comparison between prices
occurs. *Smith-Corona Grp. v. United States*, 713 F.2d 1568, 1578 (Fed. Cir. 1983).

The Federal Circuit considered a challenge to Commerce's deduction of Section
232 duties in *Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States*, 63
F.4th 25 (Fed. Cir. 2023). It held that duties imposed under Section 232 were
deductible from U.S. price as "United States import duties." *Borusan*, 63 F.4th at 37
(quoting 19 U.S.C. § 1677a(c)(2)(A)). Proclamation 9705 requires that "the duty
newly being imposed was to add to, and not partly or wholly offset, the antidumping

duties that would be due without the new duty." *Id.* at 34. The duties are to be imposed "in addition to any other duties," and "[a]ll anti-dumping, countervailing, or other duties and charges applicable to such goods shall continue to be imposed." Proclamation 9705, 83 Fed. Reg. at 11,627, 11,629. Combining the statutory directive on calculating the U.S. price with the Proclamation's terms, the Federal Circuit instructed:

> [W]hen applied to an article covered by antidumping duties, the Proclamation 9705 and antidumping duties must together result in a full imposition of both duties …. *i.e.*, by subtraction of the Proclamation 9705 duty from the U.S. price if the Proclamation 9705 duty is built into it. Otherwise, the Proclamation 9705 duty would be offset substantially or completely by a reduction in the antidumping duty itself (through an increase in the U.S. price and therefore a decrease in the dumping margin), defeating the evident "in addition to" prescription of Proclamation 9705.

*Borusan*, 63 F.4th at 35.

Nippon Steel argues that *Borusan* does not control the outcome of its three cases. First it argues that, even under *Borusan*, Commerce's decision to deduct the Section 232 duties was not supported by substantial evidence. Pl.'s Suppl. Opening Br. (Pl.'s Suppl. Br.) at 11, No. 21-533, ECF No. 64; Pl.'s Suppl. Reply Br. (Pl.'s Suppl. Reply) at 3, No. 21-533, ECF No. 68. Nippon Steel points to 19 U.S.C. § 1677a(c)(2)(A), which directs Commerce to deduct from a respondent's U.S. price any "United States import duties" the respondent "included in" the price it ultimately charged to its first unaffiliated customer. The company claims Commerce failed in all three administrative reviews to make record-supported findings that the Section 232 duties Nippon Steel paid were actually "included in" the price Nippon Steel

charged its first unaffiliated customer.  *Compare* 19 U.S.C. § 1677a(c)(2)(A), *with* Pl.'s Suppl. Br. at 11–14, ECF No. 64, *and* Pl.'s Suppl. Reply at 7–9, ECF No. 68.  The Government and Nucor respond that Nippon Steel forfeited this argument by failing to raise it during the administrative reviews.  Def.'s Resp. to Pl.'s Suppl. Br. (Def.'s Suppl. Resp.) at 16–20, ECF No. 65; Def.-Int. Nucor's Suppl. Resp. Br. (Nucor's Suppl. Resp.) at 3–6, ECF No. 66.  Nippon Steel counters that it preserved the argument by making a "broad" claim that Commerce "improperly deducted the Section 232 steel duties from [Nippon Steel's] U.S. price" in its case briefs in all three administrative proceedings and its filings in this Court.  Pl.'s Suppl. Reply at 3, 6–7, ECF No. 68.  Alternatively, Nippon Steel says the Court could exercise its discretion to address the issue.  *Id.* at 4.

Second, Nippon Steel claims Commerce's determination is inconsistent with the United States' treaty obligations — an issue *Borusan* did not address.  Pl.'s Suppl. Br. at 20, ECF No. 64.  The United States is a signatory to the General Agreement on Tariffs and Trade (GATT), which sets tariff rates on imports of certain goods, including steel articles.  *See* General Agreement on Tariffs and Trade art. II:1(a)–(b), Oct. 30, 1947, 61 Stat. A-14, 55 U.N.T.S. 200 [hereinafter GATT] (incorporating the updated Schedules of Concessions incorporated into the GATT, Marrakesh Agreement, Apr. 15, 1994, 1867 U.N.T.S. 243).  When it deducts the Section 232 duties from Nippon Steel's U.S. prices, Commerce increases Nippon Steel's dumping margin.  That increased dumping margin imposes duties on Japanese steel imports greater than the GATT's approved rates.  *See* Pl.'s Mem. in Supp. of Mot. for J. on

Agency R. (Pl.'s Br.) at 31–32, No. 21-533, ECF No. 32; Pl.'s Reply in Supp. of Mot. for J. on Agency R. (Pl.'s Reply) at 16, No. 21-533, ECF No. 39; Pl.'s Suppl. Br. at 22, ECF No. 64. Nippon Steel argues this result is improper under the *Charming Betsy* canon, which provides that a statute "ought never to be construed to violate the law of nations if any other possible construction remains." *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804).

The Government and Nucor argue that the deduction does not violate the United States' treaty obligations; or if it does, it is not a matter for this Court to remedy. Def.'s Suppl. Resp. at 21–22, ECF No. 65;[1] Def-Int. Nucor's Resp. Br. (Nucor's Resp.) at 28–30, No. 21-533, ECF No. 36; Nucor's Suppl. Resp. at 6–7, ECF No. 66. The Government explains that any conflict between a statute and the GATT is a matter for Congress — not the judiciary. Def.'s Suppl. Resp. at 21–22, ECF No. 65. Furthermore, the Government argues that a national security exception to the GATT applies, making Nippon Steel's claims irrelevant. *Id.* at 21–22 (citing GATT art. XXI(b)). Nucor adds that only the U.S. Government is statutorily permitted to challenge such an action for being "inconsistent with" the GATT. Nucor's Suppl. Resp. at 7, ECF No. 66 (quoting 19 U.S.C. § 3512(c)(1)(B)).

Nippon Steel disputes that the GATT's national security exception applies. *See* Pl.'s Suppl. Br. at 23–25, ECF No. 64. It relies on World Trade Organization (WTO) panel reports to support its argument that the exception only applies in times of

---

[1] Fellow Defendant-Intervenors Steel Dynamics, Inc. and SSAB Enterprises, LLC "endorse and adopt the arguments raised by" the Government and Nucor. Steel Dynamics and SSAB's Suppl. Resp. Br., No. 21-533, ECF No. 67; *see also* Steel Dynamics and SSAB's Letter Supp. Nucor's Resp., No. 21-533, ECF No. 38.

"armed conflict" or "general instability." *Id.* at 23–24, ECF No. 64 (quoting Panel Report, *Russia – Measures Concerning Traffic in Transit*, WTO Doc. WT/DS512/R (adopted Apr. 26, 2019)). Because the Federal Circuit did not consider how the *Charming Betsy* canon might apply, Nippon Steel asserts that this Court is free to address it. *See id.* at 21, ECF No. 64; Pl.'s Suppl. Reply at 10, ECF No. 68.

Third, Nippon Steel argues that *Borusan* was wrongly decided. *See* Pl.'s Suppl. Br. at 25, ECF No. 64; Pl.'s Suppl. Reply at 12, ECF No. 68. It believes the Federal Circuit's decision conflicts with case precedent, principles of statutory interpretation, and administrative law by focusing on the President's intent instead of Congress' intent. Pl.'s Suppl. Br. at 25–36, ECF No. 64; Pl.'s Suppl. Reply at 12–17, ECF No. 68. Nippon Steel also claims it raises several distinct arguments that the parties in *Borusan* did not present to the Federal Circuit. *See* Pl.'s Br. at 9–33, ECF No. 32 (arguing that a complete analysis of 19 U.S.C. § 1677a(c)(2)(A) requires a different result, the temporary nature of Section 232 duties warrants treating them like special duties, and Commerce imposes an impermissible double remedy by deducting the Section 232 duties from U.S. prices); Pl.'s Suppl. Br. at 35, ECF No. 64 (incorporating arguments from opening brief by reference). The Government and Nucor similarly reject this claim, noting that the Federal Circuit's decision binds this Court regardless of its correctness. *See* Def.'s Suppl. Resp. at 23, ECF No. 65; Nucor's Suppl. Resp. at 7, ECF No. 66. They also dispute that any of Nippon Steel's "additional arguments" were left unaddressed by the appellate court. *See* Def.'s Suppl. Resp. at 28–30, ECF No. 65; Nucor's Suppl. Resp. at 10–11, ECF No. 66.

## Downstream Sales Data

The third administrative review of the Order brings one additional issue to the table. To calculate the dumping margin, the agency compares the U.S. price and the normal value of the subject merchandise. 19 U.S.C. § 1675(a)(2)(A). Normal value is the sale price of the foreign like product sold "for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade." 19 U.S.C. § 1677b(a)(1)(B)(i). In other words, Commerce must determine if the company under investigation sells the same product in its home country for more than its selling price in the United States.

Nippon Steel reported selling hot-rolled steel in the Japanese market to affiliated companies who then resold it to unaffiliated customers. Nippon Steel Section B Questionnaire Resp. (June 30, 2020) at B-5, No. 21-533, J.A. at 80,011, ECF No. 40. The affiliates' sales to unaffiliated customers are known as downstream sales. "Sales to affiliated companies raise the question of whether the transactions reflect true market price." *Saha Thai Steel Pipe Pub. Co. v. United States*, 47 CIT __, 663 F. Supp. 3d 1356, 1370 (2023). Commerce may only consider a company's sales to affiliates if Commerce is "satisfied that the price is comparable to the price at which the exporter or producer sold the foreign like product to a person who is not affiliated with the seller." 19 C.F.R. § 351.403(c).

When examining sales to affiliated parties, Commerce applies an arm's-length test to determine whether the transactions were truly made in the ordinary

course of trade.  *See Timken Co. v. United States*, 26 CIT 1072, 1079 (2002) (describing the arm's-length test).    When transactions with affiliated customers are found to be not at arm's length, Commerce excludes them from the calculation of normal value, *id.*, and may instead use the affiliates' downstream sales to calculate normal value.  19 C.F.R. § 351.403(d).

In its initial questionnaire, Commerce asked Nippon Steel to report the downstream sales its affiliates made in the Japanese domestic market during the period of review.  Initial Questionnaire (May 4, 2020) at B-2, No. 21-533, J.A. at 1,041, ECF No. 41.  Nippon Steel responded by sending sales data for several affiliates but not all.[2]  Nippon Steel Section B Questionnaire Resp. (June 30, 2020) at B-7, No. 21-533, J.A. at 80,013, ECF No. 40.  It claimed it made "multiple written requests and numerous telephone calls to each of the affiliates" to track down the data.  *Id.* at B-6, J.A. at 80,012.  It even "hired local Japanese counsel for the sole purpose of managing the data collection efforts."  *Id.*

Nippon Steel stated that it "intend[ed] to continue to act to the best of its ability to collect" the missing data but claimed Japanese law limited its actions.  *Id.* at B-7, J.A. at 80,013.  It asserted that the Japanese Antimonopoly Act prohibited it from (1) "threat[ening] … to cease selling to or doing business with its affiliated customers if they did not provide downstream sales data" or (2) "[c]easing sales to affiliated

---

[2] Nippon Steel did not submit downstream sales data for three of its affiliates.  Nippon Steel Suppl. Questionnaire Resp. (Feb. 2, 2021) at 1–2, No. 21-533, J.A. at 81,416–17, ECF No. 40.  However, Nippon Steel only disputes Commerce's determination regarding one affiliate's downstream sales, Pl.'s Br. at 33, ECF No. 32; thus, the Court limits its discussion to the information Nippon Steel put on the record for that affiliate.

customers if they do not provide downstream sales data." *Id.* Nippon Steel submitted a legal memorandum prepared by a Japanese law firm to support its position. Ex. B-23, Nippon Steel Section B Questionnaire Resp. (June 30, 2020) (Japanese Legal Mem.) at 1, No. 21-533, J.A. at 80,634, ECF No. 40. The memorandum assumed Nippon Steel is in a superior bargaining position relative to its affiliated resellers. *Id.* at 5, J.A. at 80,638. It concluded that Nippon Steel would unlawfully "abuse … [its] superior bargaining position" if it threatened to stop doing business with its resellers unless they provided the data. *Id.* at 4–5, J.A. at 80,637–38. The memorandum further found that any refusal by Nippon Steel to sell to resellers because of their failure to provide the data would constitute an "unjust refusal to trade" under the Act. *Id.* at 5–6, J.A. at 80,638–39 (capitalization altered).

Commerce sent Nippon Steel a supplemental questionnaire asking for more information about the missing data. Suppl. Questionnaire (Jan. 14, 2021) at 1, No. 21-533, J.A. at 1,174, ECF No. 41. Nippon Steel again failed to submit the information. Nippon Steel Suppl. Questionnaire Resp. (Feb. 2, 2021) at 1–2, No. 21-533, J.A. at 81,416–17, ECF No. 40. Instead, it provided a communications log describing the "numerous written requests and telephone calls" it made to one of the affiliates and attached copies of emails they exchanged. *Id.* at 2, J.A. at 81,417; Ex. SB-1, Nippon Steel Suppl. Questionnaire Resp. (Feb. 2, 2021) (Commc'n Log), No. 21-533, J.A. at 81,703–40, ECF No. 40. The exchange consisted of eighteen communications, including twelve emails, exchanged over a nearly one-year period. *Id.* In the emails, Nippon Steel repeatedly asked its affiliate for updates on when it

would submit the sales data Commerce requested. *Id.* The affiliate often failed to respond; and when it did, it asked for more time to comply with Nippon Steel's request. *Id.* at 81,735.

In its Final Results, Commerce found that Nippon Steel sold its products to affiliated resellers at non-arm's-length prices so that it was necessary to use downstream sales to calculate normal value. Issues and Decision Mem. (Aug. 23, 2021) at 13, No. 21-533, J.A. at 2,473, ECF No. 41. The agency also determined that Nippon Steel failed to cooperate to the best of its ability in providing downstream sales data. *Id.* Commerce therefore applied facts available with an adverse inference to fill the gap left by the missing data. *Id.* at 14–15, J.A. at 2,474–75. It assigned the highest unaffiliated home market price on the record to the unreported downstream sales. *Id.* Assigning a higher home market price made it more likely Commerce would find Nippon Steel was selling merchandise at higher prices in Japan than in the United States.

Commerce reasoned that Nippon Steel's decision to makes sales at non-arm's-length prices gave Nippon Steel its choice of resellers, and it was therefore free to pick between "affiliates which would cooperate and those that will not." *Id.* at 13, J.A. at 2,473. Selling to a noncooperative affiliate could be beneficial to Nippon Steel. *Id.* It could "manipulate the dumping calculations by shielding high priced home market sales behind a wall of uncooperative affiliates." *Id.* Put another way, Nippon Steel could make sales to an affiliate at Price A, a lower price. The affiliate could then resell the good to an unaffiliated customer at Price B, a higher price. Despite

not making the sale itself, Nippon Steel benefits from the profit off the higher price as a partial owner of the affiliate. Thus, Commerce seeks to use the affiliate's downstream sale at the higher Price B to calculate Nippon Steel's normal value and ensure an "apples [to] apples" comparison occurs. *Smith-Corona Grp.*, 713 F.2d at 1578. The agency dismissed Nippon Steel's argument that coercing its affiliate to provide the requested data would violate Japanese law. Issues and Decision Mem. (Aug. 23, 2021) at 14, No. 21-533, J.A. at 2,474, ECF No. 41. It found that Nippon Steel "provided an insufficient explanation as to if and how this law would apply." *Id.* Commerce claimed it was simply applying U.S. antidumping law, "not directing [Nippon Steel] to violate Japanese law." *Id.*

Nippon Steel argues that neither the record nor Commerce's reasoning in its memorandum support finding that it failed to cooperate to the best of its ability as required by statute. *See* 19 U.S.C. 1677e(b); Pl.'s Br. at 38–41, ECF No. 32. It claims the record shows it made extensive efforts to obtain the missing data, including numerous communications with its affiliate. Pl.'s Br. at 40, ECF No. 32. The company also points to its legal analysis of how Japanese law limits its course of action and evidence showing its "limited ownership of and lack of control over [its affiliate]." *Id.* at 39–40; Pl.'s Reply at 22, ECF No. 39. Commerce wrote that Nippon Steel chose to sell to an uncooperative affiliate, but Nippon Steel claims it could not have anticipated its affiliate's noncooperation because the affiliate "indicated multiple times it would try to cooperate." Pl.'s Br. at 39, ECF No. 32.

The Government and Nucor respond that Commerce's determination was lawful because Nippon Steel knew Commerce would request information regarding its affiliates' downstream sales. Def.'s Resp. to Mot. for J. on Agency R. (Def.'s Br.) at 28–29, No. 21-533, ECF No. 33; Nucor's Br. at 32, ECF No. 36. Commerce had requested similar information in past administrative reviews, and Nippon Steel similarly was unable to provide it. *See, e.g.*, *Nippon Steel & Sumitomo Metal Corp. v. United States*, 44 CIT __, 483 F. Supp. 3d 1214, 1224–25 (2020). Nucor and Commerce suggest Nippon Steel had other options for obtaining the data that it did not explore, such as adding a clause to its contract with affiliates requiring them to provide the data Commerce requests. *See* Def.'s Br. at 29, ECF No. 33; Nucor's Br. at 34, ECF No. 36.

## Procedural History

As noted above, these issues span three separate administrative reviews of the same Order — the third, fourth, and fifth reviews. The third administrative review has a period of review of October 1, 2018, through September 30, 2019. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 67,712, 67,715 (Dep't of Com. Dec. 11, 2019). It contains both issues. *See* Compl. ¶¶ 14–20, No. 21-533, ECF No. 9. The fourth administrative review has a period of review of October 1, 2019, through September 30, 2020. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 78,990, 78,992–93 (Dep't of Com. Dec. 8, 2020). The fifth administrative review has a period of review of October 1, 2020, through September 30, 2021. *Initiation of Antidumping and*

*Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 67,685, 67,687 (Dep't of Com. Nov. 29, 2021). Both involve only the Section 232 duties issue. *See* Compl. ¶¶ 13–14, No. 22-183, ECF No. 9; Compl. ¶¶ 13–18, No. 23-112, ECF No. 9. Following USCIT Rule 1's directive to "secure the just, speedy, and inexpensive determination of every action," the Court joined the three cases for hearing and decision. Scheduling Order (July 18, 2023), No. 21-553, ECF No. 62. This opinion dispenses with the pending motions in all three matters and allows for the immediate appeal of the cases involving the fourth and fifth administrative reviews.

There is one final procedural wrinkle. In the case arising from the third administrative review, Nippon Steel complains that Commerce miscalculated its net U.S. price by failing to include certain revenue sources. Pl.'s Br. at 41–46, ECF No. 32. In the Issues and Decision Memorandum, Commerce stated its Final Results were based on "the total revenue" Nippon Steel reported. Issues and Decision Mem. (Aug. 23, 2021) at 21, No. 21-533, J.A. at 2,481, ECF No. 41. Commerce calculated Nippon Steel's total revenue by adding together two values: gross revenue and billing adjustments. Margin Program, J.A. at 82,532–82,730, ECF 40. Nippon Steel argued that this calculation is — likely inadvertently — incorrect. It is too low because it overlooks revenue for extra services that Nippon Steel reported separately. Pl.'s Br. at 42–46, ECF No. 32. Nippon Steel explains that one of its U.S. affiliates issued separate invoices to customers for extra embossing, slitting, and cutting services. *Id.* at 42, ECF No. 32. Though Nippon Steel reported its revenue from each of these extra

services in separate, corresponding revenue fields, Commerce ignored them when making its total revenue calculation.  *Id.* at 42–44.

Commerce requested a partial voluntary remand to reconsider the revenue for these extra services.  *See* Def.'s Br. at 31–32, ECF No. 33.  The Court granted the request, Order Granting Remand (July 1, 2022), No. 21-533, ECF No. 42, and Commerce filed its Remand Results a month later.  Remand Results (Aug. 1, 2022), No. 21-533, ECF No. 43.  This time, it added the revenue Nippon Steel reported for extra services to calculate the net U.S. price.  *Id.* at 5.  No party contests the Remand Results.  *See* Pl.'s Comments (Aug. 15, 2022) at 2, No. 21-533, ECF No. 48 (asking the Court to sustain the Remand Results).

### Oral Argument

The Court held oral argument on May 10, 2024, and questioned the parties about both the Section 232 and downstream sales issues.  *See generally* Oral Arg. Tr., No. 21-533, ECF No. 79.  Regarding Section 232 duties, the Court first turned to Nippon Steel's argument that Commerce failed to find Nippon Steel included the duties in its U.S. prices.  *See id.* at 29:6–20, ECF No. 79.  Nippon Steel's counsel was unable to point to anything in the record showing that it raised this objection during the agency proceedings and instead claimed "[t]here was really nothing … for [it] to address" at the agency-level because Commerce did not make an explicit finding in its preliminary decision memorandum.  *Id.* at 31:11–12.  The Court then asked if it was "bound by [*Borusan*]" and whether "that's the end of the matter," to which Nippon Steel's counsel responded, "Right."  *Id.* at 42:10–11.  Nippon Steel's counsel added,

"[W]e recognize that we're in a difficult position with this Court, and certainly if the Court believes that its hands are tied, … we are … prepared to take this up *en banc* with the Federal Circuit." *Id.* at 42:11–15.

## JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction pursuant to 28 U.S.C. § 1581(c), which grants the Court exclusive jurisdiction over final antidumping duty determinations. The Court must set aside any of Commerce's "determination[s], finding[s], or conclusion[s]" found to be "unsupported by substantial evidence on the record, or otherwise not in accordance with law …." 19 U.S.C. § 1516a(b)(1)(B)(i). "[T]he question is not whether the Court would have reached the same decision on the same record[;] rather, it is whether the administrative record as a whole permits Commerce's conclusion." *See New Am. Keg v. United States*, No. 20-00008, 45 CIT __, 2021 Ct. Intl. Trade LEXIS 34, at *15 (Mar. 23, 2021). Furthermore, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)).

When reviewing agency determinations, findings, or conclusions for substantial evidence, the Court assesses whether the agency action is reasonable given the record as a whole. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006); s*ee also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the

Court Nos. 1:21-cv-00533, 1:22-cv-00183, 1:23-cv-00112 (SAV)                Page 20

record fairly detracts from its weight."). The Federal Circuit has described "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

## DISCUSSION

The parties raise two issues. First, in the third administrative review, they ask the Court to answer whether Commerce lawfully applied facts available with a partial adverse inference to fill in missing information about the affiliates' downstream sales. Second, they ask the Court to answer whether Commerce properly deducted Section 232 duties from Nippon Steel's U.S. prices. The Court finds Commerce failed to support its determination regarding the downstream sales with substantial evidence and remands the issue to Commerce. The Court sustains Commerce's deduction of the Section 232 duties as "United States import duties."

## I.    Application of Facts Available with a Partial Adverse Inference

When a respondent fails to provide necessary information, Commerce may draw an adverse inference from the facts available. But Commerce must support its decision with substantial evidence. The Government and Nucor argue that Commerce's determination was lawful because Nippon Steel has repeatedly failed to provide information from its resellers despite knowing Commerce would request the information. *See* Def.'s Br. at 28, ECF No. 33; Nucor's Br. at 32, ECF No. 36. They suggest Nippon Steel could have ensured its affiliate's compliance by making the

provision of the data a contractual obligation or otherwise refused to do business with noncooperative affiliates. *See* Def.'s Br. at 29, ECF No. 33; Nucor's Br. at 34, ECF No. 36. Nippon Steel argues that Commerce failed to properly support its decision on the record, and all Commerce's contrary arguments are *post hoc* rationalizations. *See* Pl.'s Br. at 38–41, ECF No. 32; Pl.'s Reply at 20, ECF No. 39. The Court agrees with Nippon Steel.

## A.

When foreign merchandise is sold in the United States at less than its fair value — thereby injuring a domestic industry — the law allows Commerce to impose antidumping duties on the merchandise. Antidumping duties equal the amount by which the foreign market value, known as the "normal value," of the merchandise exceeds the U.S. price of the merchandise. 19 U.S.C. § 1677b(a). When Commerce is missing data necessary to calculate the normal value of merchandise, the antidumping statute provides a two-part process to fill the gap. *See* 19 U.S.C. § 1677e(a)–(b). The statute enables Commerce to use "facts otherwise available" in place of the missing information if:

(1)    necessary information is not available on the record, or
(2)    an interested party or any other person —
    (A)    withholds information that has been requested by [Commerce],
    (B)    fails to provide such information by the deadlines for submission of the information or in the form and manner requested, …
    (C)    significantly impedes a proceeding under this title, or
    (D)    provides such information but the information cannot be verified ….

*Id.* § 1677e(a).

Separately, Commerce may apply an adverse inference when selecting from the facts available if "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from [Commerce] ...." *Id.* § 1677e(b)(1)(A). "Compliance with the 'best of its ability' standard is determined by assessing whether respondent has put forth its maximum effort to provide Commerce with full and complete answers ...." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). "While the standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping." *Id.* Commerce may not draw an adverse inference merely because a respondent "fail[ed] to respond." *Id.* at 1383. Instead, it must have been "reasonable for Commerce to expect ... more forthcoming responses." *Id.*

## B.

There is no question here that necessary information was missing. Commerce asked Nippon Steel for all its downstream sales data so that it could calculate the merchandise's normal value, and Nippon Steel failed to provide data from an affiliate. *See* Nippon Steel Section B Questionnaire Resp. (June 30, 2020) at B-7, No. 21-533, J.A. at 80,013, ECF No. 40. Commerce was therefore free to select from facts otherwise available to fill the gap. *See* 19 U.S.C. § 1677e(a). But the agency went further and applied an adverse inference; therefore, it also must show that Nippon

Steel did not "put forth its maximum effort" to obtain the missing data. *Nippon Steel*, 337 F.3d at 1382.  This Commerce did not do.

Nippon Steel went to some lengths attempting to obtain the missing data from its reseller.  It hired outside counsel for assistance and sent its affiliate numerous communications requesting the data or updates on when it could expect the data.  *See* Nippon Steel Suppl. Questionnaire Resp. (Feb. 2, 2021) at 2, No. 21-553, J.A. at 81,417, ECF No. 40; Commc'n Log, J.A. at 81,703–40, ECF No. 40.  Then it submitted a legal memorandum explaining to Commerce why it believed Japanese law prohibited it from taking more action to collect the data.  *See* Japanese Legal Mem., J.A. at 80,634–40, ECF No. 40.  These additional steps went beyond the efforts Nippon Steel made in the past.  *See Nippon Steel & Sumitomo Metal*, 44 CIT __, 483 F. Supp. 3d at 1225 (describing an earlier administrative review when Nippon Steel sent only one letter to its affiliates).  Commerce cannot ignore these increased efforts.

Instead, its final decision failed to discuss the communications log Nippon Steel provided.  Regarding the legal memorandum, Commerce merely asserted it was not asking Nippon Steel to violate Japanese law.  Issues and Decision Mem. (Aug. 23, 2021) at 14, No. 21-533, J.A. at 2,474, ECF No. 41.  This conclusory statement fails to engage with Nippon Steel's six pages of legal analysis in any meaningful way.  It may be the case that the memorandum from Nippon Steel's counsel is flawed.  But the Court does not have the benefit of Commerce's view on what Japanese law may require of Nippon Steel because the agency's decision elides the issue.  When the facts change, Commerce cannot rest on its laurels and repeat the answers of yesterday.  It

must instead explain how the new facts did or did not affect its analysis. *See Nippon Steel*, 337 F.3d at 1383; *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014) ("[E]ach administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record."). Because no such explanation is found in the Issues and Decision Memorandum, the Court may not sustain Commerce's determination.

## C.

Commerce's lack of an adequate explanation is confirmed by the Government and Nucor's having to introduce arguments not found in the Issues and Decision Memorandum to justify the agency's conclusions. Both argue Nippon Steel should have been prepared to provide the data during the third administrative review because Commerce had requested the same data in previous reviews. *See* Def.'s Br. at 28, ECF No. 33; Nucor's Br. at 32–33, ECF No. 36. But Commerce cannot rely on what it said in past administrative reviews to fill in gaps it left here. *See Shenzhen Xinboda Indus. Co. v. United States*, 44 CIT __, 456 F. Supp. 3d 1272, 1285 n.22 (2020) ("[E]ach administrative review is a separate segment of an antidumping proceeding and each with its own, unique administrative record …."). If Commerce believes Nippon Steel's repeated failures over multiple administrative reviews prove it has not put forth its maximum effort to comply, it should have said so in its decision here.

One *post hoc* rationalization is just as useless as another. The Government and Nucor additionally argue Nippon Steel could have restructured its contract to require its affiliate to provide sales data to Commerce or simply refused to do business

with the affiliate.  *See* Def.'s Br. at 29, ECF No. 33; Nucor's Br. at 34, ECF No. 36.

Nowhere in the Issues and Decision Memorandum did Commerce make this point or

respond to Nippon Steel's counterpoint that Japanese antitrust law would prohibit it

from doing so.  The Government and Nucor cannot now retroactively write a response

into the agency's decision.  *See Burlington Truck Lines, Inc. v. United States*, 371 U.S.

156, 168 (1962) ("The courts may not accept appellate counsel's *post hoc*

rationalizations for agency action[.]").  The Court therefore **REMANDS** this issue to

Commerce to reconsider or further explain its decision to apply an adverse inference

to Nippon Steel's downstream sales.  As part of any explanation, Commerce should

respond to Nippon Steel's arguments regarding (1) Japanese antitrust law and (2)

any increased efforts to engender affiliate compliance by Nippon Steel compared to

past administrative reviews.

## II.    Deduction of Section 232 Duties

In all three cases, Nippon Steel claims Commerce improperly deducted Section

232 duties from Nippon Steel's U.S. prices.  It raises three arguments:  (1) Commerce

failed to properly support a finding that Nippon Steel included the cost of its Section

232 duties in its U.S. prices; (2) Commerce's treatment of the Section 232 duties as

"United States import duties" is inconsistent with the United States' treaty

obligations and therefore improper; and (3) the Federal Circuit's *Borusan* opinion was

wrongly decided.   As explained below, all three of these arguments necessarily fail.

## A. Forfeiture

Nippon Steel forfeited its argument that Commerce insufficiently supported its finding that Nippon Steel included the cost of Section 232 duties in its prices. Nippon Steel's argument is premised on the language of 19 U.S.C. § 1677a(c)(2)(A), which states that the respondent's U.S. price "shall be … reduced by … the amount, if any, *included in* such price, attributable to … United States import duties" (emphasis added).  In other words, Commerce should only deduct the duties if the respondent included the cost of them in the prices it ultimately charged its U.S. customers.  In theory, a respondent could absorb the cost of the duties and not pass them on to its customers.  Commerce would not deduct the duties from the respondent's U.S. price in that case, which in turn would result in a decreased dumping margin for the respondent.

The Government and Nucor argue Nippon Steel forfeited the argument by waiting to raise it for the first time in its supplemental brief to this Court.  *See* Def.'s Suppl. Resp. at 16–20, ECF No. 65; Nucor's Suppl. Resp. at 3–6, ECF No. 66.  Nippon Steel disagrees.  It claims it could not have made the argument earlier because Commerce failed to make explicit findings in its preliminary decision memorandums that the duties were included in Nippon Steel's prices.  *But compare* Pl.'s Suppl. Reply at 6, ECF No. 68, *with* Issues and Decision Mem. (Aug. 23, 2021) at 8, No. 21-533, J.A. at 2,468, ECF No. 41 (*final* decision concluding that "[Nippon Steel] included section 232 duties in the price of subject merchandise sold to unaffiliated customers in the United States …."), Issues and Decision Mem. (May 19, 2022) at 8, No. 22-183,

J.A. at 3,711, ECF No. 47 (same), *and* Issues and Decision Mem. (May 1, 2023) at 7,

No. 23-112, J.A. at 3,283, ECF No. 22 (same).  Furthermore, it says the issues it raised

during the administrative proceedings were broad enough to include the specific

argument it now presents.  *See* Pl.'s Suppl. Reply at 3–4, ECF No. 68.  Nippon Steel

finally notes that the Court can exercise its discretion to reach the argument even if

it would otherwise be forfeited.  *Id.* at 4–6.

The Court "shall, where appropriate, require the exhaustion of administrative

remedies."  28 U.S.C. § 2637(d).  An interested party challenging the final results of

an administrative review "must present all arguments" it considers "relevant" in its

case brief at the agency-level.   19 C.F.R. § 351.309(c)(2).   The purpose of this

requirement is threefold.  First, the rule "recognizes that an agency ought to have an

opportunity to correct its own mistakes with respect to the programs it administers

before it is haled into federal court."  *Ellwood City Forge Co. v. United States*, 46 CIT

__, 582 F. Supp. 3d 1259, 1272 (2022) (internal quotations omitted).   Second,

exhaustion "promotes judicial efficiency because it requires parties to make

arguments first before the agency that the agency may then moot before they reach

court."  *Id.*   Third, where the issue is not resolved at the administrative level,

"exhaustion still produces a useful record for subsequent judicial consideration,

especially in a complex or technical factual context."   *Id.* (internal quotations

omitted).

The Court asked Nippon Steel's counsel to point to where in the record it raised

the argument it now presents.  *See* Oral Arg. Tr. at 29:14–15, No. 21-533, ECF No.

79.  Nippon Steel's counsel failed to do so.  *Id.* at 30:8–38:24.  Indeed, the record contains no such argument.  Nippon Steel attempts to shift the burden by claiming it had "nothing … to address," *id.* at 31:11–12, but its attempt is unavailing.  It ignores the plain text of the regulation, which requires that "all arguments" be presented to Commerce in a party's brief.  *See* 19 C.F.R. § 351.309(c)(2); *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1375 (Fed. Cir. 2010) ("Commerce regulations require the presentation of all … arguments in a party's administrative case brief.").  The statute's text is similarly plain that Commerce must find that Nippon Steel included Section 232 duties in its U.S. prices before Commerce may deduct the duties.  As this is a statutorily required finding, any lack of evidence on point would be a fatal error on Commerce's part:  The agency would have failed to meet its required burden of proof.  It is hardly unreasonable to require a party to timely claim that Commerce has failed to meet the minimum evidentiary burden.  *See Boomerang Tube LLC v. United States*, 856 F.3d 908, 913 (Fed. Cir. 2017) (holding that the CIT abused its discretion by not requiring exhaustion when the parties knew what data was "in the record prior to Commerce's preliminary determination" but failed to object in their agency brief).  Therefore, it is "appropriate" to require Nippon Steel to raise its objection first before the agency.  *See* 28 U.S.C. § 2637(d).

This is not a new legal requirement.  *See* 19 U.S.C. § 1677a(c)(2)(A) ("The price … shall be … reduced by … the amount … included in such price, attributable to … United States import duties ….") (1994).  Indeed, the Federal Circuit recognized this requirement in *Borusan*.  Borusan raised many arguments about why Section 232

duties should not be deducted from its U.S. price, but the Federal Circuit noted that Borusan did not contest whether the duties were "included in" its prices.  *Borusan*, 63 F.4th at 31 ("There is no properly preserved dispute before us about Commerce's determination … that the duty imposed by Proclamation 9705 was in fact included in Borusan's U.S. prices."); *id.* n.3 ("Borusan did not challenge that determination before the [CIT] …. Nor did Borusan challenge the determination in this court until its reply brief, … which was too late.").  Just as in *Borusan*, it was Nippon Steel's burden to object if it believed the record evidence did not support a finding that it included the duties in its prices.  *See* 19 C.F.R. § 351.309(c)(2).  Waiting until its supplemental brief to this Court is too late.  *Compare* Pl.'s Suppl. Reply at 6, ECF No. 68, *with Borusan*, 63 F.4th at 31 n.3.

Nippon Steel cannot save itself by retroactively discovering its new argument among the claims it did make to Commerce.  To preserve an argument, a litigant's brief must "alert[] the agency to the argument with reasonable clarity and avail[] the agency with an opportunity to address it."  *Luoyang Bearing Corp. v. United States*, 28 CIT 733, 761 (2004); *see also Navneet Educ. Ltd. v. United States*, 47 CIT __, No. 1:22-cv-00132, 2023 Ct. Intl. Trade LEXIS 194, at *41–43 (Dec. 29, 2023) (citing *Qingdao SeaLine Trading Co. v. United States*, 36 CIT 451, 470–71 (2012)) ("An undeveloped claim made before an agency … is forfeited.").  "[V]ague, unsupported allegations do not serve to preserve a later hyper-specific, technical claim …."  *Navneet*, 47 CIT __, 2023 Ct. Intl. Trade LEXIS 194, at *41–43 (rejecting respondent's attempt to turn "a three-sentence argument before Commerce into a multi-page

attack in court"); *see also Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) (rejecting argument as forfeited for failure to raise it before the agency despite claim that the argument was "simply another angle to an *issue* which it did raise").

Nippon Steel challenged the preliminary results in each administrative review because "[Commerce] improperly deducted Section 232 duties from [Nippon Steel's] U.S. prices." Nippon Steel's Admin. Br. at 5, No. 21-533, J.A. at 83,005, ECF No. 40 (capitalization altered); Nippon Steel's Admin. Br. at 5, No. 22-183, J.A. at 85,203, ECF No. 46 (same); Nippon Steel's Admin. Br. at 5, No. 23-112, J.A. at 85,854, ECF No. 21 (same). This statement is too vague for Nippon Steel's current purposes. It does not "alert[] [Commerce] … with reasonable clarity" to Nippon Steel's new challenge — that Commerce made insufficient factual findings about whether Nippon Steel included the Section 232 duties in its prices. *Luoyang Bearing*, 28 CIT at 761. Like the Federal Circuit held in *Borusan*, the challenge is not "properly preserved" by Plaintiff's broad arguments. *Borusan*, 63 F.4th at 31.

To conclude otherwise would open a Pandora's box of permissible arguments a litigant could raise for the first time in court. Such a result would be unfair to agencies, which cannot be blamed for failing to reply to arguments parties never raised. *See Unemployment Comp. Comm'n v. Aragon*, 329 U.S. 143, 155 (1946). As this Court has previously observed, "Congress does not 'hide elephants in mouseholes[]'" so that "[l]itigants should not either." *Navneet*, 47 CIT __, 2023 Ct. Intl. Trade LEXIS 194, at *43 (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S.

457, 468 (2001)).  Nippon Steel's argument is forfeited, and the Court declines to

exercise its discretion to consider it.[3]

## B. Application of International Law

Nippon Steel's arguments concerning international law also fall short.  To

obtain relief, Nippon Steel would have the Court step beyond its proper role and

interfere in a foreign policy matter on which Congress has spoken.  The Court declines

to do so.

The *Charming Betsy* canon provides that a statute "ought never to be construed

to violate the law of nations if any other possible construction remains."  *Schooner*

*Charming Betsy*, 6 U.S. (2 Cranch) at 118.  In other words, a court engaged in

---

[3] No exception to the exhaustion doctrine applies.  Nippon Steel first claims that the intervening judicial decision exception applies because the Federal Circuit issued *Borusan* while these cases were pending.  Pl.'s Supp. Reply at 5, ECF No. 68.  This argument is unavailing.  The statutory requirement that U.S. price be reduced by the amount of "United States import duties" that was "included in such price" is not new, *see* 19 U.S.C. § 1677a(c)(2)(A) (1994), and *Borusan* did not reinterpret this language.  Nippon Steel was not "'surprised' by a twist of the law that [wa]s impossible to predict." *Risen Energy Co. v. United States*, 47 CIT __, No. 23-00153, 2023 Ct. Intl. Trade LEXIS 170, at *5 (Nov. 30, 2023) (citation omitted) (declining to apply the intervening judicial decision exception).

Second, Nippon Steel claims it could not have raised the issue during the agency proceedings because Commerce waited until publishing its final Issues and Decision Memorandums to find that Nippon Steel included the cost of Section 232 duties in its U.S. prices.  Pl.'s Supp. Reply at 5–6, ECF No. 68; *see also Jiaxing Brother Fastener Co. v. United States*, 34 CIT 1455, 1466 (2010) (stating that the Court "will decide an unexhausted issue on the merits when the party raising the issue had no opportunity to do so before the agency").  But as the Court has already explained, Commerce necessarily found that Nippon Steel included Section 232 duties in its U.S. prices when Commerce stated in its preliminary decision memorandums that Nippon Steel's Section 232 duties should be treated as "United States import duties" under the statute and deducted from U.S. price.  *See, e.g.*, Prelim. Decision Mem. (Feb. 18, 2021) at 17, No. 21-533, J.A. at 2,449, ECF No. 41.  If Nippon Steel believed there was a dearth of evidence to support this mandatory finding, the time to object was then. *See Boomerang Tube*, 856 F.3d at 913 (holding that, because the parties knew what data was "in the record prior to Commerce's preliminary determination," at "that point" the parties knew what evidence Commerce could use and thus should have made their objection in their brief to the agency); *see also* 19 C.F.R. § 351.309(c)(2).

statutory construction should presume Congress did not intend to violate international law unless Congress says otherwise. The *Charming Betsy* canon is a canon of statutory interpretation — not a matter of constitutional law — and therefore it is "not [a] mandatory rule[]." *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001); *see also* Antonin Scalia & Bryan A. Garner, READING LAW 59 (2012) ("No canon of interpretation is absolute."). Congress is free to override the canon via legislation. *Cf. Chickasaw Nation*, 534 U.S. at 94 (noting that "other circumstances evidencing congressional intent can overcome their force").

Nippon Steel asks the Court to apply the *Charming Betsy* canon to find that Commerce's determination is inconsistent with the United States' treaty obligations under the GATT. *See* Pl.'s Br. at 30–33, ECF No. 32; Pl.'s Reply at 16, ECF No. 39; Pl.'s Suppl. Br. at 20–23, ECF No. 64. It explains that GATT Articles II:1(a) and (b) require members to comply with the GATT's bound tariff schedule. Pl.'s Br. at 23, ECF No. 32; Pl.'s Reply at 16, ECF No. 39; Pl.'s Suppl. Br. at 23, ECF No. 64; *see also* GATT art. II:1(a)–(b). This schedule sets a limit on the tariffs the United States can apply to steel imports from Japan. *See Schedule of Concessions and Commitments*, WTO Doc. No. WT/Let/493 (May 17, 2005) (current Schedule). By reading 19 U.S.C. § 1677a(c)(2)(A) to allow for the deduction of Section 232 duties from a respondent's U.S. prices, Commerce increases a respondent's dumping margin; and that increased dumping margin imposes duties on Japanese steel imports greater than the GATT's bound tariff rates. According to the Plaintiff, that renders the Federal Circuit's reading of the statute improper under the *Charming Betsy* canon because it conflicts

with international law.  *See* Pl.'s Br. at 30–33, ECF No. 32; Pl.'s Reply at 16, ECF No. 39; Pl.'s Suppl. Br. at 22–23, ECF No. 64.  Nippon Steel adds in support that WTO panels have narrowly construed the GATT's national security exception, *see* GATT art. XXI(b)(iii), so that it cannot apply to save the Section 232 duties.  *See* Pl.'s Reply at 16–18, ECF No. 39.

The Government and Nucor respond that a conflict between a statute and the GATT is not a matter for the courts to decide.  *See* Nucor's Resp. at 28–30, ECF No. 36; Def.'s Suppl. Resp. at 21–22, ECF No. 65; Nucor's Suppl. Resp. at 6–7, ECF No. 66.  Additionally, Nucor claims that companies like Nippon Steel are statutorily prohibited from challenging a government agency for taking actions inconsistent with the GATT.  *See* Nucor's Suppl. Resp. at 7, ECF No. 66 (citing 19 U.S.C. § 3512(c)(1)(B)).  Even if this Court could address Nippon Steel's challenge, the Government argues that the GATT's national security exception nonetheless applies. *See* Def.'s Suppl. Resp. at 21–22, ECF No. 65.

Nippon Steel's arguments fail because Congress has spoken.  The *Charming Betsy* canon is merely an interpretive aide that Congress is free to override.  Congress has done so here in two separate ways, leaving the *Charming Betsy* canon foundered at sea.  First, Congress passed 19 U.S.C. § 3512(c)(1)(B), which prohibits Nippon Steel from challenging Commerce's determination on the ground that it does not comply with the United States' treaty obligations.  The statute provides:

> No person other than the United States … may challenge, in any action brought under any provision of law, any action or inaction by any department, agency, or other instrumentality of the United States, any

> State, or any political subdivision of a State on the ground that such
> action or inaction is inconsistent with such agreement.

19 U.S.C. § 3512(c)(1)(B).  One "such agreement" is the GATT.  *See* 19 U.S.C. §

3511(d)(1) (identifying "The General Agreement on Tariffs and Trade 1994" as a trade

agreement under the same part).  Thus, Congress has determined that the question

of whether the United States is in compliance with the GATT is not judicially

cognizable unless the United States is the plaintiff.  As Nippon Steel is not the federal

government, it cannot raise this argument in court.

Second, Congress has passed another statute confirming Nippon Steel's

challenge fails.  19 U.S.C. § 2504(a) provides, "No provision of any trade agreement

…, nor the application of any such provision to any person or circumstance, which is

in conflict with any statute of the United States shall be given effect under the laws

of the United States."  Thus, Congress determined what happens when a federal

statute and the GATT conflict — the statute wins.  In the legal hierarchy, treaties

and federal statutes are of equal authority.  *Foster v. Neilson*, 27 U.S. (2 Pet.) 253,

314 (1829) (Marshall, C.J.) ("Our constitution declares a treaty to be the law of the

land.  It is, consequently, to be regarded in courts of justice as equivalent to an act of

the legislature, whenever it operates of itself without the aid of any legislative

provision.").  But in the United States, treaties are not self-executing unless their text

explicitly provides otherwise, nor are they given special status in federal law.

*Medellin v. Texas*, 552 U.S. 491, 505 (2008) (quoting *Igartua-De La Rosa v. United

States*, 417 F.3d 145, 150 (1st Cir. 2005) (en banc)) ("[W]hile treaties 'may comprise

international commitments . . . they are not domestic law unless Congress has either

enacted implementing statutes or the treaty itself conveys an intention that it be "self-executing" and is ratified on these terms.'").  A treaty receives "the Advice and Consent of the Senate" to be ratified; and it typically becomes operative American law when both houses of Congress enact legislation implementing the treaty.  U.S. CONST. art. II, § 2; *see also Foster*, 27 U.S. (2 Pet.) at 314 ("[W]hen the terms of the stipulation import a contract, when either of the parties engages to perform a particular act, … the legislature must execute the contract before it can become a rule for the Court.").  How a treaty is implemented is Congress's prerogative.  Here, Congress has directed that, when the GATT and a federal statute collide, the statute governs, sinking the *Charming Betsy* canon in the process.  No precept of international law permits the Court to ignore the legislated directives of Congress.

Nippon Steel's reliance on WTO panel decisions is unavailing for the same reason.  If the text of a treaty cannot countermand a Congressional statute, neither can the opinions of international arbitrators.  *See* 19 U.S.C. § 2504(a); *Corus Staal BV v. Dep't of Com.*, 395 F.3d 1343, 1348 (Fed. Cir. 2005) (quoting *Timken Co. v. United States*, 354 F.3d 1334, 1344 (Fed. Cir. 2004)) ("WTO decisions are 'not binding on the United States, much less this court.'").  Past practice confirms that it is Congress — not the courts — that determines whether and how to bring United States trade laws into accord with the nation's treaty obligations.

Most items imported into the United States must disclose the item's country of origin to its "ultimate purchaser" — the last person in the United States to receive the product in the same form in which it was imported.  19 U.S.C. § 1304(a); 19 C.F.R.

§ 134.1(d).  In 2009, the U.S. Department of Agriculture (USDA) finalized a rule making it more difficult for importers to label certain imported meats as originating from the United States.  *See Mandatory Country of Origin Labeling of Beef, Pork, Lamb, Chicken, Goat Meat, Wild and Farm-Raised Fish and Shellfish, Perishable Agricultural Commodities, Peanuts, Pecans, Ginseng, and Macadamia Nuts*, 74 Fed. Reg. 2,658 (USDA Jan. 15, 2009) (codified at 7 C.F.R. § 65.260).  Meat that was packaged in the United States but came from animals that were born or raised elsewhere could no longer be labeled as originating from the United States.  7 C.F.R. § 65.260(a)(1).

This change started a chain reaction.  Canada and Mexico initiated proceedings at the WTO, claiming that the country-of-origin labeling regulations violated the United States' treaty obligations.  *See* Panel Report, *United States – Certain Country of Origin Labelling (COOL) Requirements,* ¶¶ 1.4, 3.1–3.4, WTO Doc. WT/DS384/R, WT/DS386/R (adopted July 23, 2012).  A WTO dispute settlement panel agreed and found that the COOL regulations improperly treated domestic products more favorably than imports.  *Id.* ¶ 8.3.  The United States appealed to the then-extant WTO Appellate Body, and the Appellate Body also found in favor of Canada and Mexico.  *See* Appellate Body Report, *United States – Certain Country of Origin Labelling (COOL) Requirements*, ¶ 496, WTO Doc. WT/DS384/AB/R, WT/DS386/AB/R (adopted July 23, 2012).  The Dispute Settlement Body allowed Canada and Mexico to compel the United States' compliance by authorizing them to impose over $1 billion in retaliatory tariffs annually against the United States.  Arbitration Decision,

*United States – Certain Country of Origin Labelling (COOL) Requirements*, ¶ 7.1, WTO Doc. WT/DS384/R, WT/DS386/R (Dec. 7, 2015).  Congress reacted.  Days later, it repealed all COOL requirements on certain meat products.  *See* Consolidated Appropriations Act, Pub. L. No. 114-113, 129 Stat. 2285 (2016).  Years later, the USDA appears to have reignited the fight.  In March 2024, it finalized a new rule amending the country-of-origin labeling regulations to approximate the language it adopted in 2009.  *Voluntary Labeling of FSIS-Regulated Products with U.S.-Origin Claims*, 89 Fed. Reg. 19,470 (USDA Mar. 18, 2024).  Canada and Mexico have once again threatened to retaliate against the United States. Tobias Burns, "*Made in the USA" Meat Rule Sparks Trade Battle*, THE HILL (Mar. 15, 2024), bit.ly/4dyKKCW (last visited Oct. 4, 2024).

Notably, at no point in this sequence did a federal court intervene.  Nor should it have.  *Cf. Hernandez v. Mesa*, 589 U.S. 93, 113 (2020) ("Foreign policy and national security decisions are 'delicate, complex, and involve large elements of prophecy' for which 'the Judiciary has neither aptitude, facilities[,] nor responsibility.'") (quoting *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 284 (2018) (Gorsuch, J., concurring)).  Congress has spoken clearly.  When federal statutes and U.S. treaty obligations under the GATT collide, federal statutes win.  19 U.S.C. § 2504(a).  Parties aggrieved by the collision must bring their cases to Congress, not to the courts.  *See* 19 U.S.C. § 3512(c)(1)(B).  Exercising power expressly granted it by the Constitution, Congress has made its statutes supreme and reserved to itself the ability to settle any international conflict of laws.  *See* U.S. CONST. art. I, § 8, cl. 3 ("The Congress shall

have Power … To regulate Commerce with foreign Nations[.]").  Accordingly, this Court rejects Nippon Steel's invitation to interfere with a dispute whose resolution is committed to the political branches.

## C. The Effect of *Borusan*

Nippon Steel's arguments also fail because the Court is bound by the Federal Circuit's recent decision in *Borusan*.  While this case was pending, the Federal Circuit held in *Borusan* that Section 232 duties should be considered "United States import duties" under 19 U.S.C. § 1677a(c)(2)(A) and accordingly deducted from U.S. price. *Borusan*, 63 F.4th at 37.  Nippon Steel now argues that *Borsusan* does not apply because it was wrongly decided.  *See* Pl.'s Br. at 9–30, ECF No. 32; Pl.'s Reply at 2–16, ECF No. 39; Pl.'s Suppl. Br. at 35, ECF No. 64.  The Government and Nucor respond that this Court is bound by the Federal Circuit's precedent, which addressed all of Nippon Steel's arguments.  Def.'s Suppl. Resp. at 28–30, ECF No. 65; Nucor's Suppl. Resp. at 10–11, ECF No. 66.  The Court agrees.

This Court cannot disregard Federal Circuit precedent no matter how much Nippon Steel may disagree with the Federal Circuit's reasoning.  *See Nature's Touch Frozen Foods (West) Inc. v. United States*, 47 CIT __, 639 F. Supp. 3d 1287, 1311 (2023).  Even Nippon Steel acknowledges that the Court's hands are tied.  *See* Oral Arg. Tr. at 42:10–11, No.  21-533, ECF No. 79 (The Court:  "I'm bound by [*Borusan*], and that's the end of the matter?"  Nippon Steel's Counsel:  "Right.").  Nippon Steel can therefore make its argument that the Federal Circuit is wrong to one of two courts in the country that has the power to agree with it.

## CONCLUSION

Nippon Steel is correct that Commerce did not adequately respond on the record to its argument that its efforts to gain the cooperation of its affiliate were enough to avoid Commerce's drawing an adverse inference against it. The Court therefore **GRANTS** Nippon Steel's Motion for Judgment on the Agency Record on that issue in Case Number 21-533 covering the third administrative review. This Court does not, however, have the power to review decisions of the Federal Circuit or to adjudicate alleged conflicts between federal law and the General Agreement on Tariffs and Trade. Nippon Steel's remaining Motions are therefore **DENIED**, and the Court **SUSTAINS** Commerce's determinations in the fourth and fifth administrative reviews as well as the remaining portions of the third administrative review. Accordingly, it is hereby:

**ORDERED** that Commerce shall file its Remand Determination in Case Number 21-533 with the Court within 90 days of today's date; and it is further

**ORDERED** that Defendant shall supplement the administrative record with all additional documents considered by Commerce in reaching its decision in the Remand Determination;

**ORDERED** that Plaintiff shall have 30 days from the filing of the Remand Determination to submit comments to the Court;

**ORDERED** that Defendant shall have 30 days from the date of Plaintiff's filing of comments to submit a response;

Court Nos. 1:21-cv-00533, 1:22-cv-00183, 1:23-cv-00112 (SAV)                Page 40

**ORDERED** that Defendant-Intervenors shall have 21 days from the date of Defendant's filing to submit their responses; and

**ORDERED** that Plaintiff shall have 14 days from the date of Defendant-Intervenors' filings to submit an optional reply.

**SO ORDERED.**

Stephen Alexander Vaden, Judge

Dated: Octo 10, 2024

New York, New York